IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOHNNA LEWIS o/b/o                                                                          PLAINTIFF
W. B. S.

v.                                             CIVIL NO. 08-2014

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action on behalf of her minor child, W. B. S., seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner), denying W. B. S.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

## I. Background:

Plaintiff filed an application for SSI on W. B. S.'s behalf on May 17, 2004, alleging that W. B. S. became disabled on October 30, 1991, due to attention deficit hyperactivity disorder ("ADHD"), possible bipolar disorder, seizure disorder, and possible Asperger's syndrome. (Tr. 57). An administrative hearing was held on April 28, 2006. (Tr. 57). W. B. S. was present and represented by council. (Tr. 419-462). At the time, W. B. S. was 14 years old and in the eighth grade. (Tr. 429).

The Administrative Law Judge ("ALJ"), in a written decision dated August 7, 2006, found that W. B. S.'s impairments were severe. However, he concluded that he had no limitations in the areas of acquiring and using information, moving about and manipulating objects, self-care, and health and physical well being. The ALJ found that W. B. S. had less than marked limitations with regard to attending to and completing tasks and interacting and relating to others. (Tr. 17-18). As

such, the ALJ determined that W. B. S.'s impairment did not meet, medically equal, or functionally equal any listed impairment. (Tr. 18).

On August 7, 2006, the Appeals Council declined to review this decision. (Tr. 4-7). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the matter is now ready for decision. (Doc. # 8, 9).

**II. Standard of Review:**

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(I); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment

if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a).  To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains.  *See* 20 C.F.R. § 416.926a(b)(1).  The six domains are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being.  *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings.  *See* 20 C.F.R. § 416.926a(d).  A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities.  Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities.  *See* 20 C.F.R. § 416.926a(e)(3).

### III. Discussion:

Of particular concern to the undersigned is the ALJ's determination that W. B. S. has less than marked limitations in the areas of attending to and completing tasks and interacting and relating to others.  The record shows W. B. S. had significant behavior problems at home and school.  (Tr.

4

**AO72A**
**(Rev. 8/82)**

161). W. B. S. was physically and emotionally abused by his stepfather and was reportedly sexually abused by another man. (Tr. 161-162). In September 2003, he received outpatient counseling for bipolar disorder. (Tr. 161). In October 2004, W. B. S. moved in with his aunt, Johnna Lewis, because "his mother could not provide a structured, non-chaotic environment." (Tr. 162).

At the April 2006 administrative hearing, W. B. S. testified that W. B. S. spent weekends with his aunt and lived with his mother and stepfather during the week so he could attend school in Fort Smith, Arkansas. (Tr. 413, 423, 452).

On October 4, 2004, W. B. S. underwent a mental status examination by Dr. Scott McCarty. (Tr. 161-165). Testing revealed a performance IQ of 84, a verbal IQ of 102, and a Full Scale IQ of 87, indicating a low average range of intelligence. (Tr. 163). On the Wide Range Achievement Test-3, W. B. S. functioned on the eighth grade level in reading, seventh grade level in spelling and sixth grade level in math. (Tr. 164). Dr. McCarty noted that W. B. S. showed a poor ability to relate to others due to oppositional, impulsive, and aggressive behavior toward others. (Tr. 164). W. B. S. associated with delinquent peers and had been arrested for breaking and entering. (Tr. 164).

There was evidence that W. B. S.'s behavior, moods, and grades had improved after he began taking Abilify, a medication used to treat his bipolar disorder. (Tr. 161-164). However, he remained detached socially and emotionally with evidence of withdrawal from social interaction. Dr. McCarty concluded W. B. S. did not qualify for a diagnosis of mental retardation based on his IQ scores, but he did qualify for bipolar disorder by history. He then referred W. B. S. to Arkansas Children's Hospital to be evaluated for Asperger's syndrome. (Tr. 162, 165). Dr. McCarty opined that W. B. S.'s prognosis over the next twelve months was "hopeful with continued medication and outpatient

5

therapy compliance given his significant improvement in mood and behavior with his new medication." (Tr. 165).

On October 27, 2004, a Dennis Developmental Center School Report revealed that W. B. S. did not seem to be accepted by his peers, had difficulty following directions, and was poorly motivated. (Tr. 102-107).

In December 2004, W. B. S.'s counselor referred him to Vista Health Center in Fayetteville, Arkansas, for a psychiatric evaluation and medication management. (Tr. 187). Dr. Richard Lloyd, noted W. B. S. had tried several ADHD medications, including Adderall XR, Concerta, Strattera, Dexedrine, and Ritalin, with no benefit. (Tr. 187). W. B. S. was started on Celexa, but it caused psychotic symptoms and aggressive behavior. W. B. S. took Abilify, but it made him sleepy. (Tr. 187). Dr. Lloyd diagnosed him with bipolar disorder and tapered him off the Abilify. (Tr. 188-189). He then prescribed Depakote and assessed W. B. S. with a Global Assessment of Functioning ("GAF") of 45. Dr. Lloyd noted that W. B. S.'s prognosis for ongoing control of presenting symptoms was guarded. (Tr. 189).

Teacher, Kalyn Allison competed a school questionnaire December 15, 2004. (Tr. 70-72). Ms. Allison stated that W. B. S. had serious problems concentrating on class work and problems completing assignments on time. She also found serious detriments on a daily basis with the W. B. S. responding poorly to change. W. B. S. had noticeable problems that interfered with his academic or social project when considering his inability to stay on task and noticeable problems because he was easily intimidated, experienced problems learning from mistakes, exhibited defiant disobedience, and had problems with self confidence and maturity. (Tr. 70-72).

School questionnaires and emails from other teachers at W. B. S.'s school indicated that he was a bully, hit other students, was argumentative and disruptive with outburst and excessive talking, socialized with troublemakers, had serious detriments in behavior function in that he lied and stole on a daily basis, and was noticeably aggressive. (Tr. 73, 74, 78-84). These teachers found there they were having to daily correct W. B. S. verbally with time outs, loss of privileges, special seating, and detention hall and all of these disciplines had poor responses. Records also indicate that these teachers were holding weekly parent-teacher conferences. (Tr. 78).

On January 18, 2005, Dr. Lloyd assessed W. B. S. with a GAF of forty-five (45). (Tr. 247). On February 1, 2005, W. B. S. was given after school detention for disruptive behavior, bullying and incomplete assignments. (Tr. 110). On February 3, 2005, he was sent to after school detention for failure to turn in 2 assignments. (Tr. 111). By February 28, 2005, W. B. S. had been increasingly disruptive in class for more than a month and was insubordinate to his geography teacher. (Tr. 97). He was given a one-day suspension for his disorderly conduct and use of fowl language to other students. (Tr. 97, 113). He was then scheduled to attend Saturday school to make up for missing this day of school. (Tr. 112).

This same date, W. B. S. was voluntarily admitted to the Vista Health Acute Adolescent Inpatient Treatment Program. Prior to his admission, W. B. S. had increasing emotional volatility, anger and aggression, and he had made a verbal threat to "strangle" his nine year old female cousin. (Tr. 251). At the time of admission, W. B. S. took Depakote 500 milligrams, but Dr. Lloyd subsequently changed the dosage to Depakote 250 milligrams. (Tr. 251). Dr. Lloyd also started W. B. S. on an antipsychotic medication. Dr. Lloyd noted W. B. S. benefitted from these medication changes. (Tr. 251).

On March 14, 2005, W. B. S. was transferred to the Subacute Adolescent Inpatient Treatment program. (Tr. 251). After medication adjustments, Dr. Lloyd noted W. B. S. showed marked improvement and a marked decrease in his motor tics. During his hospital stay, W. B. S. participated in individual, family, group and milieu therapy, as well as other activities. Dr. Lloyd found that during his hospital stay, W. B. S. showed gradual improvement with respect to mood and behavior. (Tr. 254). Part of W. B. S.'s treatment included a progressive series of therapeutic trial home visits so W. B. S. and his family could work on family issues in the home setting. Dr. Lloyd found W. B. S.'s last home visit went well, and he showed improved behavior. (Tr. 254). W. B. S. reported that his mood had been more stable, he had no motor tics, and he had not shown recent aggressive behavior. (Tr. 254). Dr. Lloyd diagnosed W. B. S. with mood disorder, motor tic disorder, and amnestic disorder. (Tr. 254). At discharge, Dr. Lloyd assessed W. B. S. with a GAF score of 45, indicating serious symptoms or serious impairments in social, occupational or school functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. Text Revision 2000). W. B. S. was discharged on June 7, 2005, and returned home to live with his aunt. (Tr. 251). Dr. Lloyd recommended that he attend outpatient counseling and see the attending psychiatrist for medication management. (Tr. 255). Dr. Lloyd prescribed Clonidine and placed no restrictions regarding diet or activity level. However, he concluded that W. B. S.'s prognosis for ongoing control of the presenting symptoms was only fair. (Tr. 255).

On June 23, 2005, W. B. S. presented to the Vista Health outpatient clinic for counseling. (Tr. 237-245). W. B. S.'s aunt reported that he had been doing much better with his anger control (Tr. 237). The counselor diagnosed W. B. S. with bipolar disorder without psychotic features and a motor tic disorder. He assessed a GAF score of 47. (Tr. 245). At a follow-up visit on August 4,

2005, Dr. Lloyd noted W. B. S. was off all medication and stated, "he is doing great." (Tr. 227). He noted that W. B. S. did not have a cycle of aggressive behavior the previous month, his behavior at home was appropriate, he had a good attention span without evidence of distractibility, he had a stable mood, his energy level was unremarkable, and he had no suicidal or homicidal ideation. (Tr. 227). Dr. Lloyd diagnosed W. B. S. with mood disorder, motor tic disorder, amnestic disorder, and assessed a GAF score of 45. (Tr. 227).

In July 2005, W. B. S. was taken to his pediatrician for evaluation concerning severe daydreaming. (Tr. 320-321). A sleep derived EEG was ordered. (Tr. 320).

By early September 2005, W. B. S. had two F's in school and his Aunt was extremely upset by what she classified as defiant behavior. (Tr. 214-216).

On September 9, 2005, W. B. S. was evaluated by the Fayetteville Public School and was found to be handicap with a condition of severely, emotionally disturbed. (Tr. 117). He scored below basic in math and basic in literacy. (Tr. 122, 135). Records indicate that W. B. S. daydreamed and slept during class, requiring prompting to complete work. Homework assignments were often not turned in as assigned. (Tr. 122).

In March 2006, the Fort Smith Public Schools Department of Special Education completed a Psychoeducational and Personality Review of Records. (Tr. 353-357). Again, it was determined that W. B. S. met the criteria for identification as a student with an emotional disturbance. (Tr. 353-357).

Given the aforementioned records, we believe that the case should be remanded to the ALJ for further consideration of W. B. S.'s behavioral problems. We do not find substantial evidence to support his determination that W. B. S. has less than marked limitations in the areas of attending to

and completing tasks and interacting and relating to others. The evidence makes clear that, in spite of undergoing inpatient treatment and being prescribed medication, W. B. S. continues to exhibit behavioral problems that interfere with his ability to complete tasks and interact with others.

As the record contains only RFC assessment's from non-treating, consultative doctors, or remand, the ALJ should obtain an RFC assessment from plaintiff's treating doctors. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). The ALJ should address interrogatories to the physicians who have evaluated and/or treated W. B. S., asking the physicians to review W. B. S.'s medical records; to complete a mental and physical RFC assessment regarding W. B. S.'s capabilities during the time period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding W. B. S.'s level of functioning in each domain.

### III. Conclusion:

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 23rd day of February 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE